**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

KEITH NAHIGIAN; COURTNEY
NAHIGIAN,

*Plaintiffs-Appellees,*

v.

JUNO-LOUDOUN, LLC,

*Defendant-Appellant,*

and

THE RITZ-CARLTON HOTEL
COMPANY, L.L.C.,

*Defendant.*

No. 10-2198

KEITH NAHIGIAN; COURTNEY
NAHIGIAN,

*Plaintiffs-Appellees,*

v.

JUNO-LOUDOUN, LLC,

*Defendant-Appellant,*

and

THE RITZ-CARLTON HOTEL
COMPANY, L.L.C.,

*Defendant.*

No. 10-2231

KEITH NAHIGIAN; COURTNEY
NAHIGIAN,

           *Plaintiffs-Appellants,*

               v.

JUNO-LOUDOUN, LLC,

           *Defendant-Appellee,*

               and                          No. 10-2373

THE RITZ-CARLTON HOTEL
COMPANY, L.L.C.,

                     *Defendant.*

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Senior District Judge.
(1:09-cv-00725-JCC-IDD)

Argued: December 8, 2011

Decided: May 1, 2012

Before GREGORY, SHEDD, Circuit Judges, and
Richard M. GERGEL, United States District Judge
for the District of South Carolina,
sitting by designation.

Affirmed in part, reversed in part by published opinion. Judge
Gregory wrote the opinion, in which Judge Gergel joined.
Judge Shedd wrote a dissenting opinion.

**COUNSEL**

**ARGUED:** Thomas Robert Folk, REED SMITH, LLP, Falls Church, Virginia, for Juno-Loudoun, LLC. John Chapman Petersen, SUROVELL ISAACS PETERSEN & LEVY, PLC, Fairfax, Virginia, for Keith Nahigian and Courtney Nahigian. **ON BRIEF:** Mark E. Shaffer, REED SMITH, LLP, Falls Church, Virginia, for Juno-Loudoun, LLC. Jason Frank Zellman, SUROVELL ISAACS PETERSEN & LEVY, PLC, Fairfax, Virginia, for Keith Nahigian and Courtney Nahigian.

---

**OPINION**

GREGORY, Circuit Judge:

Keith and Courtney Nahigian bought undeveloped land from Juno-Loudoun, LLC ("Juno") in Loudoun County, Virginia, in 2007. The Nahigians sued Juno in 2009 under the Interstate Land Sales Full Disclosure Act ("ILSFDA"), 15 U.S.C. § 1701, and the district court awarded the Nahigians summary judgment on their rescission claim. Juno appeals the grant of summary judgment, arguing primarily that Juno's development fell under an exception to ILSFDA's requirement that developments with at least 100 lots must file a registration statement and provide a property report to potential purchasers. The Nahigians cross appeal, arguing that they should have been awarded pre-judgment interest on the debt portion of their purchase financing. We affirm the district court's award of rescission, but reverse the district court's failure to award pre-judgment interest.

I.

The Ritz-Carlton Hotel Company, LLC ("Ritz") and Juno signed agreements in 2004-05 outlining a plan to develop a luxury golf-course community in Loudoun County that would

eventually become the Creighton Farms development. An operating agreement signed by both parties covered the management of the golf course and recreational amenities at the development. The agreement had an operating term of 20 years from the opening of the course, with the ability to extend in three ten-year blocks thereafter. Juno retained title to the development land and Ritz acquired no ownership interest. According to the agreement, the residences at the development were "not to be sold under the Ritz-Carlton brand," and all advertising had to include a disclaimer stating that the development "[was] not owned, developed or sold by the Ritz-Carlton Hotel Company, LLC," although Ritz trademarks could be used with written consent. J.A. 161.

In June 2006, the Virginia State Corporation Commission issued a certificate of incorporation to The Estates at Creighton Farms Property Owners' Association, Inc. (the "POA"). According to a master declaration filed in Loudoun County, the POA was responsible for the maintenance of common property and other services, including maintenance of landscaping and security monitoring. The master declaration said, "[I]t is anticipated that the Master Association [Juno] will enter into a management contract with Ritz-Carlton Hotel Company, LLC." J.A. 162. Such an agreement never came to pass.

The lots at the development were marketed to the public in interstate media between 2006 and 2008. Some advertisements, including one read by Mr. Nahigian, called the development a "Ritz-Carlton Managed Community" and included the Ritz trademark despite the lack of a management agreement between Ritz and Juno. J.A. 164-65. The brochure read by Mr. Nahigian also had the following disclosure:

> Creighton Farms is not owned, developed or sold by The Ritz-Carlton Hotel Company, LLC. Juno Loudoun, L.L.C. uses the Ritz-Carlton marks under license from The Ritz-Carlton Hotel Company,

> L.L.C. [sic] Juno Loudoun, LLC is the owner and developer of the project. Developer will enter into an agreement with The Ritz-Carlton Hotel Company (R-CHC) or an affiliate for the management of the golf club and master association.

J.A. 164. Mr. Nahigian, however, did not read the disclosure.

Mr. Nahigian made at least 20 visits to the development when considering whether to purchase a lot in Creighton Farms. Before the Nahigians entered into the contract, they asked Juno sales agents questions about the extent of Ritz-Carlton's involvement in the development's amenities— questions about the role of Ritz-Carlton in the development, the ability of Ritz to leave the project, and the amenities that would be offered. Kimberly Fortunato, a Juno employee and sales director, said at her deposition, "[The Nahigians'] concern was primarily could the Ritz-Carlton just walk away. My understanding was they could not." J.A. 394. Mr. Nahigian, in an affidavit, says that Fortunato declared that Ritz had a binding 30-year commitment to the development. The Nahigians never asked to see any of the agreements between Juno and Ritz, nor did they ask for written confirmation of any such agreements.

The Nahigians entered into a purchase agreement with Juno on June 1, 2007, and thereafter transferred to Juno $1,674,000 toward the sales price of their lot in Creighton Farms. The purchase agreement states that it is the complete agreement between the parties, that prior discussions are merged into its written terms, and that no party relies on any prior marketing materials or statements. It does not state that Ritz would manage Creighton Farms for any specific period of time, although it indicates that a management contract will be entered into with a Ritz affiliate.

Juno did not tell the Nahigians of their rights under ILS-FDA, as required by that statute, and Juno failed to provide the Nahigians a property report, also required by that statute.

Ritz, in early 2009, notified Juno of an "event of default" under the golf course operating agreement because Juno failed to make a required payment of $325,000 to Ritz. Ritz, Juno, and M&T Bank entered into a termination agreement on March 6, 2009, ending Ritz's involvement in the project.

On May 27, 2009, the Nahigians filed a state-court suit seeking rescission of the 2007 contract because of Juno's misrepresentations. The case was removed on July 1, 2009, and on August 28, 2009, the Nahigians filed an amended complaint in the Eastern District of Virginia against Ritz and Juno alleging fraud, violations of ILSFDA, and a violation of the Virginia Consumer Protection Act.

The district court awarded summary judgment to the Nahigians on their ILSFDA claims, finding that Juno failed to provide a property report to the purchasers prior to executing the purchase agreement, as required by ILSFDA. The court awarded the Nahigians equitable rescission. (The district court denied the Nahigians' other claims and the claims against Ritz. The Nahigians have subsequently settled with Ritz, and there is no appeal from those rulings.) The district court then awarded the Nahigians $1,674,000—the purchase price—and pre-judgment interest on the Nahigians' equity used to purchase the property. But the court did not award the Appellees interest on the money borrowed to buy the real estate.

Juno appealed the judgment on October 29, 2010, and the Nahigians filed a cross-appeal on December 3, 2010.

## II.

Juno challenges the award of equitable rescission. First, Juno argues that the Nahigians' rescission claim was barred by the two-year statute-of-limitations period provided by 15 U.S.C. § 1703(c). Second, Juno claims that the Creighton Farms development was exempt from ILSFDA's requirements. Third, Juno argues that any ILSFDA violation was

immaterial. Fourth, it claims that rescission was inappropriate because the *status quo ante* could not be restored and rescission was inequitable. We review de novo the district court's grant of summary judgment to the Nahigians, giving Juno the benefit of all reasonable inferences that may be drawn from the evidence. *See Odom v. S.C. Dept. of Corrections*, 349 F.3d 765, 774 (4th Cir. 2003). We deal with each of Juno's contentions in order, finding they are without merit.

## A.

Juno argues that § 1703(c) is the only subsection governing the right of rescission, and it provides a two-year statute of limitations.[1] Juno claims that it must have notice of the suit for it to be a timely invocation of ILSFDA rights and that it was served on June 2, 2009—one day after the two-year deadline to invoke rescission as a contractual right had passed.

The district court, however, relied on § 1711(a)(1), which provides a three-year statute of limitations for suits. 15 U.S.C. § 1711(a)(1) ("No action shall be maintained under section 1709 of this title with respect to a violation of subsection (a)(1) or (a)(2)(D) of section 1703 of this title more than three years after the date of signing of the contract of sale or lease."). The district court found that the three-year limitations period from § 1711(a) "governs those circumstances in which a purchaser seeks rescission that is not automatic, but must be supported by proper proof." *Nahigian v. Juno Lou-*

---

[1]Section 1703(c) reads,

> In the case of any contract or agreement for the sale or lease of a lot for which a property report is required by this chapter and the property report has not been given to the purchaser or lessee in advance of his or her signing such contract or agreement, such contract or agreement may be revoked at the option of the purchaser or lessee within two years from the date of such signing, and such contract or agreement shall clearly provide this right.

15 U.S.C. § 1703(c).

*doun, LLC*, 684 F. Supp. 2d 731, 745-46 (E.D. Va. January 19, 2010).

This is a matter of first impression for this Circuit.[2] We hold that the district court was correct in its ruling. In so deciding, we join the Eleventh Circuit. *See Gentry v. Harborage Cottages-Stuart, LLLP*, 654 F.3d 1247, 1262 (11th Cir. 2011).

ILSFDA provides two remedial avenues for aggrieved purchasers seeking rescission for ILSFDA violations: a contractual right to rescission and lawsuits seeking equitable rescission for violations of ILSFDA. The first avenue requires invoking one of the implied contractual rights under §§ 1703(b)-(e) for per se violations of ILSFDA. These rights can be unilaterally invoked by the aggrieved party within two years of the signing of the contract. *See* 15 U.S.C. §§ 1703(b)-(e). If the seller refuses to rescind after a purchaser exercises one of these rights, § 1709(b) allows the purchaser to file a suit to enforce that right, and the purchaser must do so within three years of the signing according to § 1711(b). The second

---

[2]Juno cites *Orsi v. Kirkwood*, 999 F.2d 86 (4th Cir. 1993), as foreclosing the Nahigians' claim. The *Orsi* Court, however, did not rule on the length of time required to file a suit seeking rescission under § 1709(a). The *Orsi* Court said, "[ILSFDA] provides a two-year statute of limitations for rescission of a contract to buy property. 15 U.S.C. § 1703(c). It provides a three-year statute of limitations for monetary damages for violations of its various sections. *Id.* at § 1711(a), (b)." 999 F.2d at 89. But the Court dropped a footnote, saying that it "need not reach the limitations issue on the . . . rescission claim" because the developer was "exempt from the requirements of the Act." *Id.* at 90 n.2. *Orsi* is best interpreted as saying that claims to rescission as of right must be brought within two years —as the plain language of § 1703(c) suggests—but it did not rule on whether rescission could be granted as a remedy under § 1711(a) and § 1709(a). *See Plant v. Merrifield Town Ctr. L.P.*, Nos. 1:08cv374, 1:08cv566, 2009 WL 2225415, at *3 n.6. (E.D. Va. July 21, 2009) (noting that "*Orsi* appears to have involved plaintiffs seeking only automatic revocation under § 1703(c), not equitable relief on a proper evidentiary showing").

avenue—and the one pursued here—is under § 1709(a), which permits suits "at law or in equity" for violations of § 1703(a) (such as not providing a property report or filing a statement of record). This second avenue allows the court to order "damages, specific performance, or such other relief as the court deems fair, just, and equitable," such as rescission. *Id.* § 1709(a). Suits under § 1709(a) must be filed within three years from the signing of the contract. *Id.* § 1711(a). Because the Nahigians filed within three years of the signing of the purchase agreement, they can pursue their claim for rescission under § 1709(a).

## B.

Next, Juno claims that the development was exempt from ILSFDA's requirements. ILSFDA does not apply to the sale of lots in subdivisions[3] containing fewer than 100 undeveloped lots. 15 U.S.C. § 1702(b)(1). ILSFDA also does not apply to "the sale or lease of lots to any person who acquires such lots for the purpose of engaging in the business of constructing residential, commercial, or industrial buildings," the so-called sales-to-builders exemption. *Id.* § 1702(a)(7). Juno argues that the lot purchased by the Nahigians was sold in a subdivision containing fewer than 100 lots because the sales-to-builders exemption applies before a lot count is performed, thereby reducing the number of lots in Creighton Farms for

---

[3]ILSFDA defines "subdivision" as land which is "divided into lots, whether contiguous or not, for the purpose of sale or lease as part of a common promotional plan." *Id.* § 1701(3). In turn, Congress created a presumption that units in a development are presumed to be part of a common promotional plan, and therefore part of the same subdivision

> where such land is offered for sale by such a developer or group of developers acting in concert, and such land is contiguous, or is known, designated or advertised as a common unit or by a common name, such land shall be presumed, without regard to the number of lots covered by each individual offering, as being offered for sale or lease as part of a common promotional plan.

§ 1701(4). The Creighton Farms development is a subdivision.

purposes of the 99-lot rule below the ILSFDA threshold. We agree with Juno that the sales-to-builders exemption applies before we count the lots; however, we find that a developer may not include future sales in determining the number of sales that fall under the sales-to-builders exemption.[4] Therefore, we find ILSFDA's disclosure regime applied to Juno's sale of a Creighton Farms lot to the Nahigians.

The plain language of § 1702(b) states that the registration and disclosure regime does not apply to "the sale or lease of lots in a subdivision containing fewer than one hundred lots which are not exempt under subsection (a) of this section," *id.* § 1702(b)(1), and the sales-to-builders exemption is included in subsection (a). This approach is consistent with the HUD guidelines, which declare that the sales-to-builders exemption applies for purposes of counting (b)(1)'s 99-lot exemption. *See* Guidelines for Exemptions Available Under the Interstate Land Sales Full Disclosure Act, 61 Fed. Reg. 13,596, 13,604 (March 27, 1996).

Juno next argues that, as the HUD guidelines state, lots intended for future sales to building contractors can likewise be deducted from the 99-lot count, and such lots "need not be specifically identified."[5] *Id.*

We are not persuaded by Juno's reasoning. HUD did not intend its guidelines to have binding effect; in fact, the beginning of the guidelines reads, "This is an interpretive rule, not a substantive regulation." *Id.* at 13,602. Because the HUD guidelines are not regulations issued with the intent that they

---

[4]Although regulations to ILSFDA allow a developer to request an opinion from the HUD Secretary as to whether a particular exemption applies to their development, 24 C.F.R. § 1710.17, there is no contention that Juno attempted to obtain such an advisory opinion.

[5]It is undisputed that the Nahigians were allowed to select from any of the remaining lots at Creighton Farms—they were not told that any lots were reserved for builders.

act as binding law, they fall under the *Skidmore* deference regime. *See Long v. Merrifield Town Ctr. L.P.*, 611 F.3d 240, 246 (4th Cir. 2010) ("While [the ILSFDA] guidelines are not binding, they are entitled to 'some deference' in interpreting the relevant statute.") (citations omitted). We defer to guidelines inasmuch as they are persuasive. *See Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

We decline to defer to the guidelines because the plain language of the statute forecloses the inclusion of future sales in the 99-lot count.[6] First, and most importantly, the plain language of the statute is in the present tense, implying the exclusion of future sales. Congress, by not explicitly including future sales to contractors in its statutory exception to ILSFDA, must have intended only to include sales already completed to contractors, not those reserved for or intended to be sold to builders. *See Nahigian v. Juno Loudoun, LLC*, 684 F. Supp. 2d 731, 745 (E.D. Va. 2010) ("[B]y its plain language, the Sales to Builders exemption does not encompass future

---

[6]We hold that the plain language is unambiguous, thereby foreclosing the use of the guidelines as an interpretive aid. But even if we thought there was some ambiguity in the statute's term "sales," we would nevertheless hold that the guidelines interpretation is not persuasive given the purpose of ILSFDA and the practical effects of the agency's interpretation described *infra* 12-14. *Cf. Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 129 S. Ct. 2710, 2716 (2009) (noting that "the presence of some uncertainty does not expand *Chevron* deference to cover virtually any interpretation of" an act given that the Court "can discern the outer limits of the [disputed] term").

Our good friend in dissent contends that the validity of the agency's reasoning is a compelling reason to adopt the guidelines view in this instance. *See post* at 23-24. It is telling that the dissent does not discuss whether the agency's view accords with the structure and purposes of ILSFDA or whether the agency's persuasiveness is diminished by the illusory protection it would afford lot purchasers in large subdivisions. Instead, the dissent focuses on the persuasiveness of the guidelines on other issues not in dispute. But it is scant evidence of the agency's persuasiveness on this particular issue that it may offer persuasive guidance on other issues.

sales 'that have yet to occur.' Such potential sales are merely speculative and are not 'exempt' under § 1702(a)(7) as they are not yet 'sales.'").

This approach is confirmed by the purpose of ILSFDA. Congress, in passing ILSFDA, wanted to ensure that "prior to purchasing certain types of real estate, a buyer [is] apprised of the information needed to make an informed decision." *Ahn v. Merrifield Town Ctr. L.P.*, 584 F. Supp. 2d 848, 853 (E.D. Va. 2008) (quoting *Markowitz v. Ne. Land Co.*, 906 F.2d 100, 103 (3d Cir. 1990)). Under the guidelines and the approach urged by Juno, a builder could avoid ILSFDA simply by declaring an intent to sell a certain number of lots to builders. The HUD guidelines suggest that all that's required for a developer to avail himself of the exception is for him to "assure himself" that he will sell the excess lots under a statutory exception. Under this interpretation, at the time of sale to any of the first 99 purchasers, it would be unclear from the perspective of the buyer whether ILSFDA should apply— even though the seller may intend for it not to apply because of future sales to contractors. *See 200 East Partners, LLC v. Gold*, 997 So. 2d 466 (Fla. Dist. Ct. App. 2008) ("We do not interpret these Guidelines to permit a developer to wait until the sale of a unit in excess of the first ninety-nine to qualify for an exemption for the remaining units."). The guidelines approach would make the protections of ILSFDA illusory. It will not be known for years after the Nahigians' initial purchase whether the lot was supposedly sold under an ILSFDA regime or not. *See Nickell*, 636 F.3d at 757 (finding ILSFDA does not suggest "purchasers must wait some unknown length of time—perhaps years—until they learn whether the lot they purchased was exempt.") (quoting *Bodansky*, 635 F.3d at 83)). Indeed, as far as this Court can tell, it is still not known.

Under the HUD interpretation, should a developer end up not falling under the exception due to a lack of excepted sales, prior sales would become voidable. *See* Guidelines for Exemptions Available Under the Interstate Land Sales Full

Disclosure Act, 61 Fed. Reg. at 13,606. This reading is contrary to ILSFDA's statute of limitations and not practical. ILSFDA provides a statute of limitations of "three years after the date of signing of the contract" for some claims, including selling a lot without delivering a property report prior to the signing of the contract. 15 U.S.C. § 1711(a)(1), (b). The statute of limitations clearly contemplates that the clock begins to tick for property report violations at the signing of the contract, implying that it must be known at the time of signing whether or not the 99-lot exemption applies. The HUD view apparently borrows from a different statute of limitations—"three years after discovery of the violation or after discovery should have been made by the exercise of reasonable diligence"—whose applicability is strictly limited to a set of claims related to fraud by the developer in connection with the sale. *Id.* § 1711(a)(2). Simply put, a failure to deliver a property report before signing need not have been done with fraudulent intent to be a violation of ILSFDA. *See id.* § 1703(a)(1)(B). The statutes of limitations are clear on their face; HUD cannot rewrite them to fit its own conception of how ILSFDA should work.

The guidelines' view also presents a practical problem. Under HUD's guidelines, aggrieved purchasers would have a right of rescission many years after their purchase. But rescission would be an impractical remedy once homeowners have built on the lot. Such a scheme would frustrate the purpose of ILSFDA.

The exception must not be read to swallow the rule. Congress presumably created the sales-to-builders exception because builders have specialized trade knowledge and do not need the same protection that the average consumer does. And the exception for developments with fewer than 99 lots was created to ease the burden of statutory compliance that ILSFDA would otherwise present to small businesses attempting to profit from small developments—one may have to hire lawyers and other specialists to be confident that ILSFDA's

strictures have been satisfied. The purpose of each exception must be read in the context of the greater purpose of ILSFDA: to protect consumers. We therefore strictly construe the 99-lot exemption.

Given the plain language of the statute and the purposes of ILSFDA, the guidelines are not persuasive, and we join our sister circuits in declining to follow its approach to future sales. *See Nickell v. Beau View of Biloxi, L.L.C.*, 636 F.3d 752, 757 (5th Cir. 2011) (interpreting § 1703(a)(2)'s exemption for contracts to erect a building within two years); *Bodansky v. Fifth on Park Condo, LLC*, 635 F.3d 75, 83 (2d Cir. 2011) (same).

There were 164 lots at Creighton Farms, and they were marketed in a common promotional scheme. Juno cannot bring its lot count to fewer than 100 using the exemptions, so we find that ILSFDA's regime applied to the sale to the Nahigians.

C.

Given that Juno is not exempt from ILSFDA, it therefore should have filed a statement of record with HUD, *see* 15 U.S.C. § 1705, and provided a property report to the Nahigians prior to executing the purchase agreement, *see id.* § 1703(a)(1)(B). It is undisputed that Juno did not take these actions. But because the Nahigians did not exercise their automatic right of rescission within two years, they must meet certain legal standards in order to receive the remedy they seek. Under federal common law, the Nahigians must show that the ILSFDA violations were objectively material. *See Griggs v. E.I. DuPont de Nemours & Co.*, 385 F.3d 440, 447 n.4 (4th Cir. 2004) (applying federal common law of rescission under ERISA); *Plant v. Merrifield Town Ctr. L.P.*, 711 F. Supp. 2d 576, 591 (E.D. Va. 2010) (applying federal common law for rescission under ILSFDA).

A good definition of a material fact is one that "would have influenced a reasonable purchaser's decision to enter into the contract for sale." *Plant*, 711 F. Supp. 2d at 592. If the violations were material, the Nahigians' suit for equitable rescission should proceed. If not, the Nahigians' motion for summary judgment should have been denied in the district court. We believe that the ILSFDA violations were material.

Section 1705 describes the things that a statement of record submitted to HUD must contain. The statute says that the property report need not contain everything required in a statement of record, but it must contain the following items: (1) "the name and address of each person having an interest in the lots in the subdivision," (2) "a legal description of, and a statement of the total area included in, the subdivision," (3) a statement of the title to the land including all encumbrances, (4) "a statement of the general terms and conditions" for sales, and (5) "a statement of the present condition of access to the subdivision . . . and the nature of any improvements to be installed by the developer and his estimated schedule for completion." 15 U.S.C. § 1705; *see also id.* § 1707(a) (stating that a property report must include certain items required for a statement of record).

The regulations promulgated by HUD under the authority granted in § 1707(a) lists the specific information that must be included in a property report to meet the statutory requirements.[7] 24 C.F.R. § 1710.100 (1996). Importantly, the recreational facilities section requires detailed information regarding the

---

[7]The Nahigians argue that a property report would contain everything required for a statement of record, despite the plain language of § 1707(a), and the statement of record would therefore include the financial statements of the seller. *See* 15 U.S.C. § 1707(a) (limiting requirements for what should be included in the property report); 15 U.S.C. § 1705(a) (listing requirements for the statement of record). The regulations do not require a financial statement, but merely a list of financial disclosures. 24 C.F.R. § 1710.112. Because Juno need not have included its financial records in its property report, it is likely that it would not have done so.

estimated dates of completion and financial assurance of completion. *Id.* § 1710.114. Similarly, Juno would have been required to "[i]ndicate who is responsible for the operation and maintenance of these facilities." *Id.* § 1710.114. At the time of contracting, there was no management agreement in place for the operation of the facilities, and Juno would have been forced to disclose this forthrightly in the property report.

The regulations also require the developer to include other facts that "would have an effect upon the use and enjoyment of the lot by the purchaser for the purpose for which it is sold or which would adversely affect the value of the lot," which mandates disclosure of the nature of the Ritz and Juno relationship. *Id.* § 1710.102(j)(2). Also required is the statement, "We do not own the (name of facility or facilities) so we can not assure its (their) continued availability." *Id.* § 1710.114(b)(1).

Juno argues that because it is obvious that Ritz might not be a partner in the development forever, the disclosures cannot be material. However, it is precisely this information about the extent of Ritz's involvement in the development's amenities that the Nahigians were seeking before they entered into the purchase agreement. They wanted to know the extent of the role of Ritz-Carlton in the development, the ability of Ritz to leave the project, and the amenities that would be offered. As Fortunato, the Juno employee and sales director, said at her deposition, "[The Nahigians'] concern was primarily could the Ritz-Carlton just walk away. My understanding was they could not." J.A. 394. Similarly, Mr. Nahigian, in an affidavit, says that Fortunato declared that Ritz had a binding 30-year commitment to the development.

Juno argues that the Nahigians' "subjective" desire to have "a lot in a community that had the Ritz name associated with it, rather than a community of equal value with equal amenities without the Ritz name" does not merit rescission. This argument is not convincing. These homes were marketed as

"Ritz-Carlton-managed communities," and the Ritz logo and brand were prominently advertised. That there was no long-term management contract between Ritz and Juno would be objectively material, regardless of a difference in value between a Ritz-managed facility and a facility with the same amenities without the Ritz name. The distinctive feature of this community was that it was purportedly a Ritz-managed development with the high level of service that comes with the Ritz name. A reasonable purchaser of a lot in the development would find information about the exact nature of the Ritz's relationship to the development and the amenities provided is material to her purchasing decision.

Because the information that would have been in a property report would have been material to the reasonable purchaser of land, we agree with the district court's ruling that Juno's ILSFDA violations were material.

## D.

The final element in the Nahigians' rescission claim under ILSFDA is a showing that the parties can be restored to their position prior to the contract, and what such a restoration would require. In awarding equitable rescission, "a court [ ] grants rescission or cancellation [of a contract], and its decree wipes out the instrument, and renders it as though it does not exist." *Griggs v. E.I. DuPont de Nemours & Co.*, 385 F.3d 440, 449 (4th Cir. 2004) (citations omitted).

Juno argues that restoration to the *status quo ante* is impossible because the fair market value of the property has declined for reasons unrelated to rescission since the contract was signed. This is a misunderstanding of what rescission is designed to accomplish. As the Nahigians point out, no plaintiff would ask for rescission if the value of the property had gone up.

The analysis is straightforward. It was material for the Nahigians to know the above-described information; they

may not have entered into the purchase contract had they known the limited extent of Ritz's involvement at that time, and they would have exercised their automatic right to rescission under ILSFDA had they been aware of it. The lack of notice of the right to rescission helps establish that equitable rescission is in fact proper in this case. It's clear the Nahigians would have exercised their right to rescission within two years of contracting had they known of the right. As soon as the Nahigians found out that Ritz was leaving the development in March 2009, they investigated the relationship between Ritz and Juno. Upon finding Ritz had no long-term legal commitment to Juno at the time they entered into the purchase agreement, the Nahigians sued for rescission under state law within two years after signing the purchase agreement.

Because the Nahigians have established that they merit equitable rescission, nullifying their Creighton Farms lot purchase, the next issue is what the Nahigians need to recover to bring them to their position before they signed the purchase agreement. Under ILSFDA, courts have wide discretion in fashioning a remedy:

> [Courts] may take into account, but not be limited to, the following factors: the contract price of the lot or leasehold; the amount the purchaser or lessee actually paid; the cost of any improvements to the lot; the fair market value of the lot or leasehold at the time relief is determined; and the fair market value of the lot or leasehold at the time such lot was purchased or leased.

15 U.S.C. § 1709. Here, as the district court determined, the proper equitable remedy is to return the property title to Juno and return the purchase price, plus interest, to the Nahigians.[8]

---

[8]Juno makes an additional argument that it is improper to return the full purchase price to the Nahigians because roughly $160,000 was paid in

### III.

The district court awarded the Nahigians interest on the equity portion of their paid purchase price, granting them pre-judgment interest at 4.99 percent. Yet the court refused to award interest on the debt portion of the same, giving no reason for distinguishing between the debt and equity portions of the purchase price. We can only reverse the district court if it was an abuse of discretion to not award the Nahigians interest on the loan. *See U.S. Fire Ins. Co. v. Allied Towing Corp.*, 966 F.2d 820, 828 (4th Cir. 1992). We find that it was an abuse of discretion, and we reverse the district court on this point, awarding the Nahigians interest at 7 percent on the BB&T Bank loan.[9]

ILSFDA provides that the court may award "interest, court costs, and reasonable amounts for attorneys' fees, independent appraisers' fees, and travel to and from the lot." 15 U.S.C. § 1709(c). The district court rightly found that the *status quo ante* should include the "value of the next-best alternative use of [the Nahigians'] capital, *i.e.*, their opportunity

cash by Mr. Nahigian's solely owned company, Nahigian Strategies, LLC. The district court correctly found that under federal and Virginia law, the income of an LLC is the same as the personal income of its owner. 26 C.F.R. § 301.7701-3(b)(ii) (stating that a limited liability company is "[d]isregarded as an entity separate from its owner if it has a single owner"); VA. CODE ANN. § 13.1-1002 (2009). In any case, rescission is an equitable remedy, and the district court has wide latitude to fashion its award.

[9]The dissent contends that the district court "carefully tailor[ed] its decision to award pre-judgment interest on some—but not all—of the purchase price." *Post* at 26. Were this the case, we would likely agree with our colleague that the district court's failure to award pre-judgment interest on the Nahigians' equity but not debt was not an abuse of discretion. But the district court did no such thing. It did not, as the dissent implies, consider "discovery sanctions against the Nahigians for their fabrication of the evidence and false testimony" as a reason to distinguish between the debt and equity, and it's not clear that the pre-judgment award would be an appropriate vehicle for resolving such issues.

cost of entering into the to be-rescinded Purchase Agreement." J.A. 221. As a general rule, "interest follows principal" in awarding judgment to plaintiffs for a legal violation. *Mary Helen Coal Corp. v. Hudson*, 235 F.3d 207 (4th Cir. 2007). "[T]he rate of pre-judgment interest for cases involving federal questions is a matter left to the discretion of the district court." *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1031 (4th Cir. 1993) (citation omitted).

The Nahigians point out that Juno has enjoyed the use of the Nahigians' money since closing—both the equity and debt portions of the purchase price. J.A. 132. There is no reason for the district court to find that the Nahigians' equity investment is more worthy of court protection than their debt investment, and the district court did not give any such reason.

The fact that the Nahigians have enjoyed the use of the property is a red herring. It was only because of Juno's wrongs that it was able to avail itself of the Nahigians' capital. To not award interest on the debt portion of the purchase price at the rate that the Nahigians obtained the financing would unjustly enrich the defendants and would not make the Nahigians whole. *See Wickham Contracting Co., Inc. v. Local Union No. 3, Intern. Broth. of Elec. Workers, AFL-CIO*, 955 F.2d 831, 834-35 (2d Cir. 1992) (finding that an award of pre-judgment interest depends on "the need to fully compensate the wronged party for actual damages suffered").

The district court found that the proper rate of pre-judgment interest on the equity portion is 4.99 percent, which was the weekly average one-year constant maturity Treasury yield at the time the interest began to accrue. In so concluding, the district court relied on the Second Circuit, which has stated that "[a] plaintiff is entitled to the income which the monetary damages would have earned, and that should be measured by interest on short-term, risk-free obligations." *Ind. Bulk Trans., Inc. v. Vessel Morania Abaco*, 676 F.2d 23,

27 (2d Cir. 1982). Such a determination was not an abuse of discretion.

Because the district court did not award pre-judgment interest on the debt portion of the purchase price, it did not have occasion to determine what interest rate was proper for the debt portion. As the parties agreed in a jointly stipulated fact, the Nahigians have been paying interest at 7 percent on the $1,500,000 in loans from BB&T. J.A. 132. In order to restore the Nahigians to their position before purchasing the land, they are entitled to recover pre-judgment interest at 7 percent.

Given that the district court provided no basis for distinguishing between the loaned funds and the Nahigians' equity, we find the district court abused its discretion when it denied the Nahigians pre-judgment interest on the debt portion of their purchase funds. We therefore reverse the district court and award the Nahigians pre-judgment interest on their BB&T-loaned funds at 7 percent.

### IV.

For the foregoing reasons, we affirm in part and reverse in part the district court's ruling.

*AFFIRMED IN PART, REVERSED IN PART.*

SHEDD, Circuit Judge, dissenting:

The majority holds that Juno-Loudoun, LLC ("Juno") is not exempt from the Interstate Land Sales Full Disclosure Act ("ILSA"), despite longstanding interpretive guidelines for ILSA to the contrary. The majority then holds that, notwithstanding the fact that ILSA does not specifically provide for pre-judgment interest, the district court nonetheless abused its discretion by failing to award pre-judgment interest to Keith and Courtney Nahigian ("Nahigians") on the debt portion of

their purchase. I disagree on both points and, accordingly, I respectfully dissent.

I

The majority correctly notes that ILSA permits developers, when determining whether a subdivision qualifies for the 100-lot exemption under 15 U.S.C. § 1702(b)(1), to subtract from the total lot-count of that subdivision any lot-sale that is exempted under 15 U.S.C. § 1702(a), including lots that are exempted because they are "sales to builders." 15 U.S.C. § 1702(a)(7); *ante*, at 9-10. In this case, the question is whether a developer may include in the "sales to builders" exemption any lots it *intends* to sell to builders in the future. The majority concludes that no future sales may be included and therefore Juno's development was not exempt from the ILSA's registration and disclosure requirements under § 1702(b)(1) because it contained more than 100 lots that were not exempt under § 1702(a).

I do not agree with the majority that future sales may not be counted. The majority holds that the plain language of ILSA *unambiguously excludes* future sales from the sales to builders exemption for purposes of the 100-lot count. *Ante*, at 11 n.6. But the plain language of ILSA does not compel such a view. Nothing in the language of ILSA explicitly prohibits counting future sales, nor does the fact that the statute is written in the "present tense" foreclose the inclusion of future sales. At best, the statute is ambiguous as to whether future sales may be counted.

Because the statutory language of § 1702 is not clear on this specific point, we may consider sources external to the statute, such as an agency's construction of the statute it administers, to determine the intended meaning of the statute. *See United States v. Mead Corp.*, 533 U.S. 218, 227-28 (2001). Here, the Department of Housing and Urban Development ("HUD") has provided the Guidelines for Exemptions

Available Under the Interstate Land Sales Full Disclosure Act, 61 Fed. Reg. 13596, 13601 (Mar. 27, 1996) (the "Guidelines"), which address the specific issue presented in this case. However, before examining what the Guidelines say, there is a preliminary question of whether, and to what extent, we should defer to the Guidelines' interpretation of ILSA.

This circuit has already determined that, at least in certain instances, the Guidelines "are entitled to 'some deference' in interpreting [ILSA]." *Long v. Merrifield Town Ctr. L.P.*, 611 F.3d 240, 246 (4th Cir. 2010). The majority analyzes the Guidelines under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), concluding that the Guidelines are not entitled to deference because they are not persuasive. Because I think the Guidelines are persuasive, I would defer to them. First, the Guidelines represent "a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore*, 323 U.S. at 140; *see, e.g.*, 61 Fed. Reg. 13596, 13601 ("The Guidelines are intended to assist a developer in determining whether or not a real estate offering is exempt from any or all of the requirements of [ILSA]."). Second, the Guidelines contain over forty pages of detailed analysis of each provision of ILSA, complete with explanations and examples, all of which suggest a "thoroughness evident in its consideration." *Skidmore*, 323 U.S. at 140. Moreover, the Guidelines were subject to public notice and comment, further underscoring the Guidelines' thorough consideration. *Cf. U.S. Dept. of Labor v. North Carolina Growers Ass'n*, 377 F.3d 345, 354 (4th Cir. 2004) ("Because the bulletins were not adopted after notice and comment rulemaking, they lack the thoroughness of such rules.").[1] Third, the "validity of [the

---

[1]*See* Guidelines for Exemptions Available Under the Interstate Land Sales Full Disclosure Act, 48 Fed. Reg. 44412 (proposed Sept. 28, 1983) (publishing "Notice of Proposed Guidelines" with comments to be received by November 28, 1983); Guidelines for Exemptions Available Under the Interstate Land Sales Full Disclosure Act, 49 Fed. Reg. 31375 (Aug. 6, 1984) (publishing "Notice of Final Guidelines") (to be codified

Guidelines'] reasoning," *Skidmore*, 323 U.S. at 140, is illustrated by the numerous instances wherein the Guidelines accord with the clear directives of ILSA, and is confirmed each time such reasoning has been upheld as valid. *See, e.g.*, *Long*, 611 F.3d at 246 (affirming and adopting the Guidelines' interpretation of § 1702(a)(2)); *see also Winter v. Hollingsworth Properties, Inc.*, 777 F.2d 1444 (11th Cir. 1985) (adopting the Guidelines' longstanding interpretation of ILSA as it relates to the sale of condominiums). Even the majority acknowledges portions of the Guidelines are consistent with the plain language of ILSA. *Ante*, at 10. Finally, the Guidelines' interpretation of § 1702 is "consistent[ ] with earlier and later pronouncements" by HUD, *Skidmore*, 232 U.S. at 140; as HUD's primary publication for explaining ILSA's numerous exemption, the Guidelines have remained substantively unchanged and unchallenged for nearly thirty years. In light of all of these factors, I find the Guidelines have the "power to persuade."[2] *Id.* Accordingly, I would defer to their interpretation of § 1702.

By deferring to the Guidelines, the resolution of this appeal is simple: the Guidelines make clear that (1) the transactions

---

at 15 C.F.R. pt. 1710 app. A); *see also* Guidelines for Exemptions Available Under the Interstate Land Sales Full Disclosure Act, 61 Fed. Reg. 13596 (Mar. 27, 1996) (streamlining final rule and noting no public notice and comment was required because the final rule "did not make substantive changes" to the previous version).

[2]The majority makes much of the purpose of the act, *ante* at 11 n.6, but it is obvious that the legislation is a balance between various interests, including lot purchasers and developers. *See, e.g.*, *Bodansky v. Fifth on Park Condo, LLC*, 635 F.3d 75, 81 (2d Cir. 2011) (noting the 100-lot exemption was added to ILSA as part of several amendments designed to "balance the consumer's need for adequate protections and remedies with the small businessman's concern with over regulation"). The existence of the exemption at question makes clear that the law is not intended to be an ironclad protection for every lot purchaser. The law strikes a balance between competing interests and the Guidelines accurately reflect that balance.

that qualify under any of the exemptions in § 1702 may include future sales, and (2) the developer is not required to specifically identify the reserved lots. *See* 61 Fed. Reg. 13596, 13604. In fact, the Guidelines provide a specific example that is nearly identical to the facts of this appeal:

> For example, a developer of a subdivision containing a total of 129 lots since April 28, 1969, qualifies for this exemption if at least 30 lots are sold in transactions that are exempt because the lots had completed homes erected on them. The 30 *exempt transactions may fall within any one exemption or a combination of exemptions* noted in §1710.5 (b) through (h) *and may be either past or future sales*. In the above example, the developer also could qualify if twelve lots had been sold with residential structures already erected on them, nine lots had been sold to building contractors and at least nine lots were reserved for either the construction of homes by the developer or for sales to building contractors. *The reserved lots need not be specifically identified.*

*Id.* (emphasis added). Clearly, under the Guidelines, Juno could include future lot-sales to builders in calculating these exemptions and was not required to identify those lots to the Nahigians. The record here is undisputed: Juno has always intended to sell "at least half, or 82" of its lots to building contractors; Juno never planned to sell more than ninety-nine lots to individuals; Juno did in fact reserve and sell lots to building contractors; and Juno never even came close to exceeding the number of transactions allowed by the 100-Lot Exemption.[3] J.A. 54-58, 294-99. Therefore, Juno is exempt from ILSA.

---

[3]Juno's plan to sell at least 65 lots to builders in order to qualify for the 100-lot exemption was explicitly expressed in a May 2005 Opinion Letter from counsel at the outset of the development's creation - not in the face of litigation as the majority implies. J.A. 57. Juno did not obtain an advisory opinion from HUD, but such an opinion is not required for the exemptions to apply. 24 C.F.R. § 1710.4(d). Additionally, had Juno obtained an advisory opinion, it is difficult to imagine that HUD would have advised Juno in a manner inconsistent with HUD's own specific Guidelines.

## II

In addition, I disagree with the majority's decision to award the Nahigians pre-judgment interest on the debt portion of their purchase. ILSA does not specifically authorize pre-judgment interest, but does give courts great discretion in determining the remedy for violations of ILSA, and provides that a court "*may* order damages . . . *or such other relief* as the court deems fair, just, and equitable." 15 U.S.C. § 1709(a) (emphasis added). As the majority correctly acknowledges, the district court has "wide latitude to fashion its award," and we should reverse the district court *only* if it abused its discretion. *Ante*, at 18-19 & n.8. In light of this standard of review, the discretion afforded by the statute, and especially given the nuances of this case (such as the discovery sanctions against the Nahigians for their fabrication of evidence and false testimony, as well as the consideration the district court gave to the § 1709(a) factors),[4] I fail to see how the district court abused its discretion by carefully tailoring its decision to award pre-judgment interest on some – but not all – of the purchase price.[5]

---

[4]Contrary to the insinuation of the majority, *ante* at 19 n.9, I do not suggest that the district court expressly noted these factors in its award of pre-judgment interest. However, it is simply a fact that the district court awarded interest on some, but not all, of the Nahigians' purchase price based on the record before it. To assume otherwise, as the majority must, means the court acted without reason or rationale. That is indeed an odd way to review a court under the abuse of discretion standard. But if the majority would apply the abuse of discretion standard in this manner, the proper result would be to remand for the district court to more clearly express its rationale.

[5]Even if we were to set aside the reasoned judgment of the district court and award the Nahigians pre-judgment interest on the debt payments, I believe the appropriate rate would be the same 4.99% awarded to the Nahigians for the equity portion of their purchase, because the district court has already decided that this rate, not the BB&T loan rate, represents the time value of their capital.

### III

For the foregoing reasons, I respectfully dissent.